ALASKA MARINE PILOTS, an Alaska organization, Appellant,

v.

Robert HENDSCH, Appellee.

Robert BOYD and Boyd Enterprises, d/b/a Alaska Marine Pilot Dispatch Services, John Schibel, individually, Richard Murphy, individually, and Harry Jacobsen, individually, Appellants and Cross–Appellees,

v.

Robert HENDSCH, Alaska Marine Pilots, an Alaska organization, Captain Thomas Dundas, individually, and Captain Stuart Mork, individually, Appellees and Cross–Appellants.

Nos. S–6729, S–6939 and S–6979.

Supreme Court of Alaska.

Dec. 12, 1997.

Mark E. Ashburn and William S. Cummings, Ashburn & Mason, Anchorage, for Alaska Marine Pilots, Captain Thomas Dundas and Captain Stuart Mork.

Cathleen Nelson McLaughlin, Brena & McLaughlin, P.C., Anchorage, for Robert Hendsch.

Robert C. Erwin, Law Offices of Robert C. Erwin, Anchorage, for Robert Boyd and Boyd Enterprises, d/b/a Alaska Marine Pilot Dispatch Services, John Schibel, Richard Murphy and Harry Jacobsen.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J. pro tem.[*]

## OPINION

CARPENETI, Justice pro tem.

### I. INTRODUCTION

These appeals follow from a lawsuit brought by Robert Hendsch against Boyd Enterprises and Alaska Marine Pilots. All three parties appeal various trial court decisions and aspects of the jury verdict.

### II. FACTS AND PROCEEDINGS

In 1988, Boyd Enterprises, d/b/a Alaska Marine Pilot Dispatch Services, and Robert Hendsch made an agreement that provided that Boyd Enterprises would dispatch Hendsch as a marine pilot [1] in western Alaska. Boyd Enterprises dispatched licensed pilots in western Alaska, assigning available pilots to particular ships as needed.

Boyd Enterprises assigned Hendsch to piloting jobs in 1988 and 1989. In September 1989, Boyd Enterprises informed Hendsch that because of difficulties between Hendsch and other pilots and customers of Boyd Enterprises, the organization would not use him as a pilot in 1990. But after discussions with Hendsch, Boyd Enterprises changed its position and agreed to dispatch Hendsch. Hendsch and Robert Boyd, on behalf of Boyd Enterprises, signed a contract that ran from September 1, 1989 to September 1, 1990.

Hendsch was not scheduled to work in December 1989 or January 1990. In January 1990, Hendsch contacted James Blackmore, president of ALAMAR, a major Boyd Enterprises customer, and told him that Boyd Enterprises had serious financial problems caused by mismanagement. Hendsch asked Blackmore if ALAMAR would support someone else running the pilot dispatch operation. ALAMAR was Boyd Enterprises' best client, accounting for forty to fifty percent of its business. Blackmore told Robert Boyd of Hendsch's allegations on February 13.

Robert Boyd testified that he terminated Hendsch immediately after hearing from Blackmore. The stated basis for the termination was Boyd Enterprises' projected work requirements and Hendsch's contact with ALAMAR. The contract between Boyd Enterprises and Hendsch allowed either party to terminate the contract on thirty days' notice.

Hendsch testified that he received a fax in Seattle on February 13 from Boyd telling him to delay his departure to Dutch Harbor and received a termination letter on February 14.

In 1990, Hendsch worked as a captain with Coastal Transportation. In 1991, Hendsch worked as a master of a fishing vessel for Trident Seafoods. In March 1991, Hendsch injured his foot on the vessel while working for Trident but continued working until July 1991. In August 1991, Hendsch was injured in a car crash. In March 1992, Hendsch had surgery on his injured foot. Hendsch filed lawsuits as a result of both the foot injury and the car crash. Robert Boyd, Boyd Enterprises (Boyd defendants [2]), and Alaska Marine Pilots [3] claim that they did not know of Hendsch's past injuries and lawsuits until "just before trial."

In 1991, the Alaska legislature revised the marine piloting statutes. The new statutes

---

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

[1]. Marine pilots are state and federally licensed independent contractors who are hired by ship operators to navigate ships through inland or coastal waters.

[2]. The Boyd defendants also include the individually-named Boyd pilots John Schibel, Richard Murphy, and Harry Jacobsen in their individual capacities.

[3]. The jury found Alaska Marine Pilots is Boyd Enterprises' successor-in-interest.

required the Alaska Board of Marine Pilots (Board) to establish pilotage regions in the state and criteria for recognizing regional marine pilot organizations. *See* AS 08.62.040(a)(4) (A and C). Licensed marine pilots were permitted to form regional pilot associations under regulations established by the Board. *See* AS 08.62.175. As a result of these changes, Boyd Enterprises dissolved in December 1991, and the marine pilots who had contracted with Boyd Enterprises formed a new regional organization under AS 08.62.175. The new organization was called Alaska Marine Pilots (AMP). While AMP involved the same pilots, it had a different structure and governing rules than Boyd Enterprises.

In January 1992, Hendsch filed a complaint against Robert Boyd and Boyd Enterprises that alleged a breach of the 1989 employment contract and breach of the covenant of good faith and fair dealing, and requested a partnership accounting. Hendsch contended that Boyd breached the contract by firing him unilaterally and without notice on February 14, 1990. Boyd filed an answer on February 28, 1992. The case was assigned to the fast track calendar under Alaska Civil Rule 16.1.

In February 1992, Hendsch applied for membership in AMP. AMP initially took no action on Hendsch's application, claiming that the Board was still reviewing AMP's request for recognition as a regional organization. AMP wrote to Hendsch and explained the reasons for its lack of attention to his application on March 10, 1992. Two AMP members, Captains Moreno and Garay, reviewed Hendsch's application on behalf of the organization. Another unnamed pilot told them there could be a problem with the Coast Guard piloting endorsements that allowed Hendsch to hold a state license. The anonymous pilot alleged that the endorsements may have been based on false information. Hendsch claims that these anonymous allegations were in regard to trips he made

in 1987, and that in 1988 the Coast Guard investigated and found no merit to these claims.[4]

Captains Moreno and Garay then obtained Hendsch's Coast Guard file to continue their investigation. Moreno and Garay concluded that it would have been physically impossible for Hendsch to have made all the trips he claimed. AMP claims that the trip requirements ensure that a pilot has the minimum necessary expertise to pilot a ship safely in a given area. AMP contends that the discrepancies raised serious doubts about Hendsch's qualifications to be a pilot.

On April 24, 1992, Hendsch again requested admission to AMP. In June 1992, Hendsch's then-attorney, R.J. Smith, met with Captains Moreno and Garay, as well as AMP's attorney David Millen, to discuss the pending membership application. AMP told Smith of the problems with Hendsch's application. Smith testified that AMP representatives told him that if Hendsch withdrew his application request, they would not report their suspicions about Hendsch's license to the state. AMP told Smith that if Hendsch continued to pursue his application, AMP would be forced to deny it and report its suspicions to state authorities.[5] Millen disputed Smith's version of what occurred at the meeting, characterizing AMP's position as simply notifying Hendsch that if he continued to press his application it would be denied, and that if he then appealed to the Board and the Board asked AMP for justification, AMP would have no choice but to give its reasons for the denial: its belief that Hendsch had falsified his records.

Hendsch did not withdraw his application, and AMP rejected it on July 29, 1992. Hendsch appealed the rejection to the Board, which began its own investigation. At the Board's request, AMP reported its suspicions about Hendsch's endorsements. Hendsch's pilot license expired in December 1992. At

---

4. To receive federal pilotage endorsements, which are necessary to obtain a state pilot's license, marine pilot applicants must certify that they have completed a minimum number of trips in and out of various ports, harbors and waterways; they must also pass a Coast Guard exam.

5. Alaska law requires individual pilots and pilot associations to report violations of pilotage law, cooperate with the Board, and protect life and property. *See* AS 08.62.157, AS 08.62.175(c)(1) and (c)(6); 12 AAC 56.310.

the time of trial it had not been renewed. Also at the time of trial, the renewal of Hendsch's federal license was delayed while the Coast Guard investigated Hendsch's endorsements.

In December 1992, Hendsch's lawsuit against Boyd Enterprises was transferred to the inactive calendar. In February 1993, Hendsch moved to amend his complaint to add AMP and Captains Dundas and Mork as defendants and alleged additional causes of action. Leave to file the amendments was granted on March 26, 1993. AMP was served in late April 1993. Hendsch and the original defendants stipulated to extending discovery until sixty days after the new defendants were served, and trial was set for September 1993. According to AMP, "due to confusion about the service of process" it did not enter an appearance until July 21, 1993. In August 1993, the superior court rescheduled the trial for January 10, 1994 and discovery deadlines were extended. The new calendaring order stated that no additional continuances would be granted without a showing of good cause.

Trial was held from January 10 to January 22, 1994. On January 25, the jury returned a verdict on the original special verdict form. In the special verdict the jury determined that AMP was a successor-in-interest to Boyd Enterprises. The jury also found that Boyd Enterprises owed Hendsch $6,862 for an accounting for 1988 and 1989. The jury also awarded Hendsch $25,000 on the breach of contract claim against Boyd Enterprises, despite finding that Boyd had a legitimate business purpose for firing him. The parties agreed that the jury should not have awarded damages for breach of contract under these circumstances. The court had instructed the jury that AMP had violated AS 08.62.175(c)(4) as a matter of law, and the jury found that this caused $108,000 in damages, of which Hendsch could have mitigated all but $1. The jury also found that AMP intentionally interfered with Hendsch's ability to make a living, causing $108,000 in damages, of which Hendsch could have mitigated only $25,600. Finally, the jury awarded Hendsch $75,000 in punitive damages against AMP.

AMP moved for a new trial. The motion was denied. To cure various inconsistencies in the verdict form, supplemental questions were submitted to the jury on January 28, and the jury returned its final verdict that same day. In the supplemental verdict, the jury found that Boyd Enterprises breached the covenant of good faith and fair dealing, causing $12,001 in damages, and that Hendsch was physically able to work in 1991, 1992, and 1993.

The Boyd defendants filed a motion for judgment notwithstanding the verdict, which was denied. Final judgment was entered against Boyd Enterprises, AMP and AMP's individual pilots on October 19, 1994.

AMP filed appeal S–6729. AMP claims that the court erred in denying the motion to continue the trial date and to allow further discovery, determining that Hendsch had a private cause of action under AS 08.62.175(c)(4), determining that AMP violated that statute as a matter of law, instructing the jury on the elements of the tort of intentional interference with prospective economic advantage, allowing Hendsch to seek punitive damages, and denying AMP's request to have the jury resolve inconsistencies in the special verdict.

Boyd Enterprises and the named pilots filed appeal S–6939. The Boyd defendants claim that the court erred in denying the motion to continue the trial date, submitting the issue of accounting to the jury, allowing the award of money against Boyd Enterprises for breach of the covenant of good faith and fair dealing after the jury found that Boyd Enterprises had good cause to terminate Hendsch, allowing individual members of an unincorporated association to be held individually liable for torts of other members when they did not participate in or ratify the torts, and instructing the jury on punitive damages.

Robert Hendsch also filed an appeal, S–6979. Hendsch contends that the trial court erred in giving an incorrect damage calculation instruction in the Supplemental Special Verdict Form, accepting the reduction in contract damages on the Supplemental Special Verdict Form from $25,000 to $12,001,

and accepting the jury's damage calculations for the 1988 and 1989 accounting.

## III. *DISCUSSION*

### A. *Whether Denial of the Motion to Continue Constituted an Abuse of Discretion*

A trial court's decision to deny a motion to continue is reviewed for an abuse of discretion. *See Johnson v. Schaub*, 867 P.2d 812, 815 (Alaska 1994). A decision "to deny a continuance will be reviewed in light of the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion." *Id.*

AMP argues that at his October 1993 deposition, Hendsch claimed he had no physical disability that kept him from working from mid–1991 to the present. AMP and the Boyd defendants later received records from Hendsch's litigation with Trident Seafoods that caused them to question whether Hendsch could have worked as a pilot during 1991 and 1992. According to AMP and Boyd, those records indicate that Hendsch had a "severe disability" that existed until December 1992.

AMP and the Boyd defendants moved for a continuance on December 12 and 13, 1993, to conduct additional discovery on the issue of whether Hendsch had made contrary claims in the earlier litigation or to his treating physicians. The trial court denied this request. However, the trial court ruled that if the defendants wished to use medical records and testimony from the prior actions, they could do so.

This decision was not an abuse of discretion. This was a fast-track case. The purpose of the fast-track rule was to reduce delays in civil litigation. *See* former Alaska R. Civ. P. 16.1(a).[6] Under the fast-track rule, a case set for trial could only be continued for "extraordinary good cause." Alaska R. Civ. P. 16.1(i). The case had already been continued once. Although AMP and Boyd

hint that perhaps Hendsch was withholding evidence, they cite no interrogatory or document production request that would have covered the materials they eventually obtained from Hendsch's previous lawsuits. The defendants were able to use the Trident Seafoods materials in the trial of the case, so any prejudice they suffered was minimal. The judge's ruling was not an abuse of discretion.

### B. *Whether a Private Cause of Action Is Implied by AS 08.62.175(c)(4)*

Alaska Statute 08.62.175(c) provides that "a pilot organization recognized by the board shall ... be open to membership by all persons licensed under this chapter to pilot vessels in the pilotage region in which the organization is recognized." The trial judge found that this section creates a private cause of action and instructed the jury accordingly. AMP argues that AS 08.62.175(c) does not create a private cause of action.

The trial court's reading of AS 08.62.175(c) involves a question of law that this court reviews in its independent judgment. *See Borg–Warner Corp. v. Avco Corp.*, 850 P.2d 628, 631 n. 8 (Alaska 1993).

AMP argues that because the legislature has created a comprehensive remedial scheme in this area, no private right of action should be found to be implied. *See Walt v. State*, 751 P.2d 1345, 1352 (Alaska 1988). Hendsch responds that AMP's violation of the statute inflicted serious economic injury on Hendsch by denying him the opportunity to work, and that none of the factors counselling against recognizing a private right of action is present in this case.

The Restatement (Second) of Torts lists the factors that help a court to determine whether or not a statute implies a private cause of action. The factors include the nature of the legislative provision, the adequacy of existing remedies, the extent to which a tort action will interfere with existing remedies, the importance of the purpose of the provision, how drastically the new tort

---

**6.** This court rescinded Rule 16.1 in July 1997. *See* Alaska Supreme Court Order No. 1266 (July 15, 1997).

will change the law, and the burden the new tort will place on the court system. *See* Restatement (Second) of Torts § 874A cmt. h (1977), *cited with approval in Walt v. State,* 751 P.2d 1345, 1351 n. 12 (Alaska 1988). Analysis of these factors leads us to conclude that AS 08.62.175(c) implies a private right of action for its violation.

As to the nature of the legislative provision, AS 08.62.175(c) is easily susceptible to individual enforcement. A single instance of denying membership to a qualified marine pilot constitutes a clear violation of the statutory command. The conduct the statute prohibits is clear and unambiguous. *Cf. O.K. Lumber v. Providence Washington Ins. Co.,* 759 P.2d 523, 527 (Alaska 1988) (rejecting creation of private cause of action where statute prohibited acts committed frequently enough to become trade practice).

In the absence of an implied cause of action, there would be no truly adequate remedy for a pilot wrongfully denied membership in a regional organization. The statute provides only a $5,000 civil fine and possible decertification of the pilot organization.[7] *See* AS 08.62.155. This provision allows the state to seek compliance with the statute, but it provides no recourse for the injured individual. As we note below, it is also fairly clear that there is no alternative common law cause of action available.[8]

A private cause of action should never be found to be implied if it would significantly interfere with existing remedies. As we noted above, there are no other apparent remedies, and neither party has suggested alternatives. A private right of action will not interfere with governmental enforcement of AS 08.62.175(c), as the government remains free to impose the penalties provided by the statute. If anything, private enforcement will assist the government.

Finally, we do not believe that this new cause of action will unduly burden the courts, or that it represents a dramatic change in the law. Additionally, we see no potential for "over-enforcement" of the law.[9] The trial court properly found a private cause of action to enforce AS 08.62.175(c).

It was also proper for the trial court to instruct the jury that AMP violated AS 08.62.175(c) as a matter of law. If Hendsch held the proper state and federal licenses, it was AMP's obligation to admit him to the organization. *See* AS 08.62.175(c). If AMP had serious doubts about the facts underlying Hendsch's licenses, it should have contacted the appropriate state and federal authorities. The authorities who issued Hendsch's credentials were the only ones in a position to question them.[10]

7. Karl Luck, Director of Occupational Licensing, testified at trial that the state might be able to decertify a marine pilot organization that violated AS 08.62.175(c)(4).

8. In *O.K. Lumber,* we noted that the statute provided modest monetary sanctions whereas a successful tort action could result in significant damages. *O.K. Lumber,* 759 P.2d at 527. This was one of the factors that led us to conclude that we could not imply a private cause of action. *Id.* In *O.K. Lumber,* we found that large tort damage awards could "upset the implicit legislative judgment that the broad proscriptions of the act are tolerable because of the limited sanctions imposed." *Id.* In this case, the behavior prohibited is not broad, or difficult to define, or inapt for individual enforcement. In the absence of such concerns, the fact that an implied cause of action would provide greater remedies than no cause of action is one of the very reasons to find that the statute implies it.

9. We also note in passing that we reject AMP's argument that AS 08.62.175(c) is health or safety legislation. While a primary purpose of regulating marine pilots is preservation of safety, there is no evidence that this is the purpose of AS 08.62.175(c). On its face, the provision seems to be directed at ensuring marine pilots a fair opportunity to pursue their callings, rather than preserving health or safety. Thus, *Reed v. Municipality of Anchorage,* 782 P.2d 1155, 1156–57 (Alaska 1989) which held that a private cause of action cannot be implied from health or safety laws, is not controlling.

10. We recognize AMP's perhaps legitimate concerns that it would be dangerous to allow an unqualified employee to join the organization. However, if AMP was concerned about Hendsch's qualifications, its only proper action in that regard was to report those concerns to the appropriate authority. *See* AS 08.62.157(b). AMP's alleged concerns about the safety of the public, although laudable, were not a legitimate basis to deny Hendsch membership. The decision about whether Hendsch is a competent and qualified pilot is for the state and federal governments to make, not AMP. Moreover, to the extent AMP was motivated by fear of liability re-

### C. Whether the Jury Should Have Been Instructed on Intentional Interference with Prospective Economic Advantage

■ We have long recognized the tort of intentional interference with prospective economic advantage. *See Ellis v. City of Valdez*, 686 P.2d 700, 706 (Alaska 1984). In *Ellis*, we held that "[u]nder this theory, a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a *third person's wrongful conduct* which is intended to disrupt the relationship." *Id.* at 707 (emphasis added).

■ The trial judge's decision to instruct the jury on the tort of intentional interference with prospective economic advantage is a question of law over which we exercise our independent judgment. *See Beck v. State Dep't of Transp. and Pub. Facilities*, 837 P.2d 105, 114 (Alaska 1992); *see also Summers v. Hagen*, 852 P.2d 1165, 1168–69 (Alaska 1993).

■ AMP argues that the facts of this case do not support a jury instruction on this tort. Quoting *Ellis*, AMP notes that this cause of action "contemplates wrongful interference with a developing relationship by an outsider to the relationship. A party who backs away from a developing economic relationship cannot be held liable for inducing himself to sever the relationship." *Ellis*, 686 P.2d at 708 (citations omitted). Hendsch claims that AMP interfered with his ability to work as a pilot and his relationship with the Board, and that he was therefore entitled to present a cause of action for intentional interference to the jury.

Hendsch's cause of action for intentional interference with prospective economic advantage is clearly precluded by Alaska law. In *Ellis*, the plaintiff sued the City of Valdez over a deal gone bad, in which the City was to have purchased property from him. *Ellis*, 686 P.2d at 703–04. When the deal fell through, Ellis sued the City claiming, among

other things, intentional interference with prospective economic advantage. *See id.* at 706. We held:

> In his reply brief, Ellis implies that Valdez improperly interfered with the relationship developing between Ellis and Valdez itself. . . . But Valdez' actions do not constitute intentional interference with another's prospective economic advantage. The only act of Valdez' which "interfered" with Ellis' prospective advantage was the city's decision not to purchase Ellis' terminal on Ellis' terms. This "arms-length" dealing is not the type of conduct prescribed by the tort. Instead, the cause of action contemplates wrongful interference with a developing relationship *by an outsider to that relationship.*

*Id.* at 707–08 (emphasis added).

AMP cannot be held liable for interference with its own relationship with Hendsch. Hendsch's vague assertions that AMP interfered with Hendsch's ability to work as a pilot and with Hendsch's relationship with the Board cannot support a claim for intentional interference with prospective economic advantage. AMP's "interference" with Hendsch's relationship with the Board did not prevent the formation of any economic relationship that would have resulted in a pecuniary benefit to Hendsch, because Hendsch never had or expected to have an economic relationship with the Board.

As to the allegation that AMP interfered with Hendsch's general ability to work as a pilot, there is no third person with whom he had a relationship with which AMP interfered. As AMP points out, there was no evidence that Hendsch was prevented from forming his own pilot association in western Alaska, and AMP did not share its concerns over Hendsch's qualifications with shipowners or their agents. Hendsch no doubt suffered a severe pecuniary loss from AMP's rejection of his application, but he has presented no evidence that the loss came from anything but the loss of the relationship with AMP itself.[11]

sulting from Hendsch piloting a vessel, Alaska law relieves regional pilot associations from all liability for claims arising from piloting a vessel. *See* AS 08.62.165(c).

11. In the case most closely on point, an Arizona appellate court ruled that the termination of an employee could not constitute interference with prospective economic advantage because the tort

As a matter of law, Hendsch could not have a claim for intentional interference with prospective economic advantage on these facts. The verdict in favor of Hendsch on the intentional interference with prospective economic advantage claim is reversed.[12]

### D. Whether There Is Adequate Support for the Jury's Verdict on the Accounting Issues

The jury found that Boyd Enterprises owed Hendsch $2,789 for the year 1988, and $4,073 for 1989. Hendsch testified at trial that he was concerned about the allocation of expenses in Boyd Enterprises in 1988 and 1989.[13] Among these concerns were $38,000 in expenses for furniture for pilot houses in 1988, and $27,000 in 1989. Hendsch testified to his belief that personal expenses were wrongfully intermingled with the expenses of Boyd Enterprises. These included Captain Boyd's legal expenses, phone bills, and expenses for taking Boyd's wife on trips. Hendsch testified that using Boyd Enterprises' financial statements, he had determined what expenses had been charged to the enterprise. For 1989, according to the financial statement, the expenses were 24% of income. For 1988, the ratio was approximately 23%. Based on the records of another company, Hendsch testified that he believed a 15% ratio was more reasonable. Using 15% as the proper ratio, Hendsch calculated that he was owed approximately $5,500 for 1988 and $8,000 for 1989.

At trial, Hendsch presented the testimony of Kevin VanNortwick, a certified public accountant. VanNortwick expressed the opinion that the allocable expenses of Boyd Enterprises showed "some unusual trends." He found what he thought were unreasonable administrative travel expenses, suspiciously large payments for two years to a particular vendor, and a large promotional expense. He also testified that it would not be proper for expense accounts to be used for personal expenses.

Boyd Enterprises claims that no evidence was presented to show that the 15% figure was the industry standard. It also alleges that there was no testimony that "specifically detailed" what expenses might have been improperly charged. Finally, Boyd Enterprises contends that for the jury awards to be appropriate, the jury would have had to have found that there were $92,966 in improper expenses in 1988 and $40,073 in improper expenses in 1989. Boyd Enterprises claims there was no evidence to support this conclusion.

In his appeal, Hendsch also attacks the jury's verdict, claiming that there is no evidence to support it. But he claims that this is because the jury award was too low, not because there was a lack of evidence to support any award at all.

▆▆▆▆ A jury's findings of fact will not be reversed when there is "room for diversity of opinion among reasonable people." *Municipality of Anchorage v. Baugh Const. & Eng'g Co.*, 722 P.2d 919, 927 (Alaska 1986).

"require[s] some contract or business expectancy ... vis-a-vis a third party. There was no contractual relation or business expectancy with a third party, only the contract which may have existed between the appellant and appellee hospital." *Paros v. Hoemako Hosp.*, 140 Ariz. 335, 681 P.2d 918, 921 (Ariz.App.1984) (citations omitted).

12. This resolution moots AMP's appeal point concerning differing amounts in mitigation of Hendsch's damages. Having found that the intentional interference claim should not have been submitted to the jury, we need not address any claimed inconsistency concerning mitigation for damages arising from that claim with mitigation for damages arising from a claim that was properly submitted.

We need not address inconsistency for a second reason: Hendsch argued below that the ver-

dicts were not inconsistent in response to AMP's request that the trial court give supplemental instructions to the jury in order to resolve the apparent inconsistency. Because Hendsch prevailed in this argument, and still does not argue that the verdicts are inconsistent, there is no occasion for us to consider the issue.

13. In Boyd Enterprises, the expenses of all pilots were pooled, as was all revenue. The difference between the revenue and the costs was then distributed to the pilots on a percentage basis based on the number of pilot days they worked out of the total number of pilot days worked by all Boyd pilots. Thus, if Hendsch could show that some expenses were not chargeable to Boyd Enterprises, he would be entitled to additional monies for 1988 and 1989.

When reviewing a motion for a directed verdict or for judgment notwithstanding the verdict, the court is to determine whether the evidence, when viewed "in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment." *Bobich v. Stewart*, 843 P.2d 1232, 1235 (Alaska 1992).

We find that there is sufficient evidence to support the jury's verdict on this issue. It appears that the jury divided what Hendsch argued the total allowable expenses for 1988 and 1989 should have been by the total income for 1988 and 1989. This yields an income/expense ratio of approximately 16%. That, of course, is fairly close to the 15% figure that Hendsch advocated. That the jury awarded this amount suggests that it gave substantial credit to the testimony of Hendsch and his accountant. The jury's award is within the range of evidence presented. Remembering that a jury's findings of fact will not be disturbed when there is "room for diversity of opinion among reasonable people," *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978), we affirm the trial court's denial of a new trial on these grounds.

### E. Whether the Award of $12,001 for Breach of the Covenant of Good Faith and Fair Dealing Was Proper

The first special verdict form asked the jury if Boyd Enterprises breached its contract with Hendsch. The jury answered that it had, so it proceeded to the next question, which asked if there was a legitimate business purpose for the termination. The jury found that there was a legitimate purpose. But the instruction following this question contained an error. It directed the jury to answer a question which, by virtue of the jury's earlier answer, was irrelevant.[14]

The court submitted a supplemental special verdict to the jury that included the questions on breach of the covenant of good faith and fair dealing from the original special verdict that the jury should have been instructed to answer, but was in fact instructed not to answer. The jury sent back a note asking if the damages for breach of the covenant of good faith and fair dealing would be in addition to the damages awarded for termination of the contract. The trial court proposed telling the jury to ignore the prior award of $25,000 when awarding damages for breach of the covenant. Hendsch's attorney objected on the grounds that the jury would then believe the money awarded for breach of the covenant would be in addition to the previous award for breach of contract. Hendsch argued that the jury should be informed that its $25,000 award was going to be ignored because of a clerical error. He proposed an instruction. AMP's attorney objected on the grounds that the proposed instruction could lead the jury into a decision not based on the merits. Instead, AMP proposed a reference to a prior jury instruction that told the jury not to worry about making overlapping awards, because the trial court would resolve such problems. The court drafted such an instruction, and Hendsch raised no objection. The jury awarded $12,001 in damages for breach of the covenant of good faith and fair dealing.

The Boyd defendants appeal because they claim there was no basis for the jury to make an award. Hendsch claims that the jury was given an erroneous instruction that caused them to mistakenly award him too little money.

---

14. The jury was asked to answer Q13, which asked, "What amount of damages, if any, was caused by the conduct which forms the basis of your verdict concerning the breach of the promise?"

Question 12 asked if the breach was the legal cause of any loss to Hendsch. It was left blank, as it should have been, because the jury found a legitimate business purpose for the termination of the contract. But the question that the jury was instructed to answer if it so found was Q13, which asked for the amount of damages caused by the breach of contract. Had the jury answered question Q12 affirmatively (that the breach caused any loss), it was also instructed to answer Q13. Thus, regardless of whether the jury answered the question about legitimate business purpose "yes" or "no", it was still asked for the amount of damages. Further, Q13, which both parties agree the jury should not have answered, directed the jury not to answer questions Q14–Q16, which dealt with the breach of the covenant of good faith and fair dealing. Those questions *should* have been answered, in any event.

1. *There was sufficient evidence to support the jury's award.*

■ The Boyd defendants argue that there was no basis for the jury to award damages for breach of the covenant of good faith and fair dealing. As we noted above, a jury's findings of fact will not be reversed when there is "room for diversity of opinion among reasonable people." *Baugh Const.,* 722 P.2d at 927. Reviewing a motion for a directed verdict or for judgment notwithstanding the verdict, we determine whether the evidence, when viewed "in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment." *Bobich,* 843 P.2d at 1235.

In *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123 (Alaska 1989) (*Luedtke I* ), we upheld an employee's termination for failing a drug test, but remanded on the issue of the employer's violation of the covenant of good faith and fair dealing. In *Luedtke I,* the employer had suspended the employee prior to terminating him. In *Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220 (Alaska 1992) (*Luedtke II* ), this court reviewed the trial court's decision on the breach of covenant issue.

■ *Luedtke II* demonstrates that it is possible for an employer to rightfully terminate an employee but to do so in a way that violates the covenant of good faith and fair dealing. *See Luedtke II,* 834 P.2d at 1223–24. The covenant essentially requires that employers "treat like employees alike" and "act in a manner which a reasonable person would regard as fair." *Id.* at 1224 (citations omitted). Damages in such a case will be limited to those that flow from the breach of the covenant and cannot include the damages an employee would be entitled to if the employee had been wrongfully terminated. *See id.* at 1226–27.

■ Based on the evidence presented, the jury could have reasonably concluded that although it was proper for Boyd to terminate Hendsch, it was not proper to do

so without thirty days' notice. The jury could have found that terminating the contract without notice constituted a breach of the covenant of good faith and fair dealing. In addition, the contract provided procedural protection for pilots if they were suspended. The jury could have found that Boyd's failure to consult other pilots violated the implied covenant that such consultations would occur prior to termination. The jury could have found these actions to be unreasonable and unfair. Thus the jury's conclusion is within the range of reasonable verdicts based on the evidence.

2. *The jury instruction on the covenant damages was not erroneous.*

Hendsch objects to the amount of damages awarded by the jury for this cause of action. Specifically, he states that because the jury was not told that its award of $25,000 in contract damages was void, the jury thought it was awarding the $12,001 in addition to the $25,000. Hendsch claims that the trial court should have instructed the jury only to decide if the covenant of good faith and fair dealing was breached, and if it was, the court should have affirmed the $25,000 in damages on that basis.

■ Hendsch admits that he did not object to the Supplemental Special Verdict Form at trial. In most cases, arguments which are not dependent on new facts and are closely related to and could have been inferred from the trial pleadings may be presented for appellate review even when not raised below. *See Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985). However, in *Conam Alaska v. Bell Lavalin, Inc.,* 842 P.2d 148 (Alaska 1992), we refused to extend this exception to jury instructions.[15] *Id.* at 153–54.

■ Nonetheless, Hendsch contends that he should be permitted to object now because the trial court's instructions to the jury constituted plain error. In *Conam Alaska,* we held that we would review an objection to a jury instruction raised for the first time on

---

15. The court based its conclusion on Rule 51(a)'s statement that "[n]o party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to

consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection." 842 P.2d at 153 n. 8.

appeal only if "the giving of the challenged instruction was plain error." *Id.* at 153 (citing *Miller v. Sears,* 636 P.2d 1183, 1189 (Alaska 1981)). We stated that "[p]lain error will be found when an obvious mistake exists such that the jury instruction creates 'a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice.' " *Id.* (quoting *Ollice v. Alyeska Pipeline Service Co.,* 659 P.2d 1182, 1185 (Alaska 1983)). In other words, the query is "whether a correct instruction would have likely altered the result." *Id.* at 153. This standard imposes "a heavy burden on the appellants to prove that an error was *highly likely* determinative." *Id.* We have emphasized that we will not speculate about whether the error changed the result. *Id.* (citing *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 92 (Alaska 1974)).

▮ In this instance, Hendsch cannot sustain the burden of showing a high likelihood that a different instruction would have created a different result. His argument that the $25,000 breach of contract award, which both parties agreed was erroneous, was somehow binding on the jury, is without merit. His argument that the jury would have awarded more had they known their $25,000 award was stricken is also not strong enough to meet his burden. The jury was specifically given an instruction not to consider the overlap effect of various awards, and the trial court properly pointed out this instruction to the jury in the court's response to the jury's questions.

Thus, we need not reach the question of the adequacy of the Supplemental Special Verdict Form. Its use was not plain error. The award for breach of the covenant of good faith and fair dealing is affirmed.

#### F. *Whether the Jury Was Properly Instructed on Punitive Damages*

Hendsch did not claim punitive damages in his complaint, nor did he move to amend the complaint to do so before trial. He did not reveal an intent to seek punitive damages during discovery. His initial instructions, submitted two weeks before trial, did not include any instructions concerning punitive damages. His first mention of punitive damages was in the trial memorandum.[16] As of the night before the jury was to be instructed, no proposed instruction on punitive damages had been presented. Hendsch did not actually present a punitive damages instruction until the day the jury was instructed.

The jury instruction on punitive damages read:

Robert Hendsch has made a claim against AMP for punitive damages. Punitive damages can be awarded if you find that AMP's actions were done with malice, bad motives, or reckless indifference to the interests of Robert Hendsch.

If you find that AMP's actions were done with malice, bad motives, or a reckless indifference to the interest of Robert Hendsch, you must then place a value on these damages, a value that can be determined based on the need to deter AMP, and similarly situated persons and entities, from engaging in such behavior in the future.

While both AMP and the Boyd defendants objected to any instruction on punitive damages, neither noted the failure of this instruction to advise the jury as to the required level of proof for punitive damages.

Under AS 09.17.020, punitive damages must be proven by clear and convincing evidence. *See State Farm Mut. Auto. Ins. Co. v. Weiford,* 831 P.2d 1264, 1266 n. 2 (Alaska 1992). The jury instruction given in this case does not tell the jury to apply the burden of proof by clear and convincing evidence. We have previously noted that "[j]ury instructions which set forth an entirely erroneous

**16.** Even this mention was equivocal: "Hendsch may also be entitled to recover other damages including punitive damages if the evidence presented supports such a claim." When the court and counsel reviewed instructions the night before the jury was to be instructed, Hendsch's counsel noted that the proposed special verdict form included a claim for punitive damages and requested permission to write an accompanying instruction. AMP and the Boyd defendants objected on the ground that punitive damages had not been pled. The objections were overruled. As of that point, neither objecting counsel had had an opportunity to object to the form of the instruction.

standard of liability" normally create a high likelihood that a plain error has been committed. *City of Nome v. Ailak,* 570 P.2d 162, 171 (Alaska 1977). As noted above, *Conam Alaska* holds that plain error will be found when the erroneous jury instruction "would have likely altered the result." 842 P.2d at 153.

The evidence at trial as to AMP's intentions—upon which the punitive damages question rested—was sharply in dispute and appeared to be closely balanced. Hendsch urged that AMP acted maliciously out of its own greed and self-interest in denying his application for membership, and he produced evidence to support his position. AMP countered that it had a good-faith concern about Hendsch's piloting credentials and advised Hendsch so that he might knowledgeably choose which course of action he would take, and it too produced supporting evidence. Given the closeness of the evidence and the arguments on this issue, it appears likely that, had the jury been instructed that it could return a punitive damages award only if the proof of malice was clear and convincing, the result would have been different.[17]

■ This conclusion follows from the substantial difference in the quantum of proof necessary to prove a proposition by a preponderance of the evidence and that required to prove the proposition by clear and convincing evidence. The preponderance of the evidence standard is met if the proponent of a proposition satisfies the fact-finder that the asserted facts are "probably true." *Saxton v. Harris,* 395 P.2d 71, 72 (Alaska 1964). For clear and convincing evidence, the proponent must "produce[ ] in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Buster v. Gale,* 866 P.2d 837, 844 (Alaska 1994) (quoting *Castellano v. Bitkower,* 216 Neb. 806, 346 N.W.2d 249, 252 (1984)).

■ We conclude that the failure to instruct the jury on the clear and convincing evidence burden of proof was plain error. The punitive damages award must be reversed.[18]

### G. Whether Individual Pilots May Be Held Liable for AMP's Actions

Defendants Boyd, Schibel, Murphy, and Jacobsen claim that they cannot be held personally liable for any damages owed to Hendsch by AMP. While Boyd was named in the caption of the complaint, Schibel, Murphy, and Jacobsen were not. Hendsch did name "JOHN DOES 1–6" whom he identified as "partners, partners, [sic] representatives, agents, and/or officers of Alaska Marine Pilots." Although Boyd's name appeared in the caption, he was not specifically alleged to have participated in AMP's decision to deny Hendsch membership.

The first time that Boyd, Schibel, Murphy, and Jacobsen were specifically named as being individually liable for AMP's decision was in the Final Judgment. The Alaska Rules of Civil Procedure allow a plaintiff to amend the complaint to add a new party, in some circumstances even after the statute of limitations has run. *See* Alaska R. Civ. P. 15; *Siemion v. Rumfelt,* 825 P.2d 896, 900–01 (Alaska 1992). Hendsch never attempted to amend his complaint to hold these individuals liable for AMP's actions.

Alaska Civil Rule 17(b) provides that an unincorporated association may be sued. This is a departure from the common law rule that a suit against an unincorporated association had to be maintained against the individual members of the association. *See* 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1861, at 214 (2d ed.1986); 6 Am.Jur.2d *Associations and Clubs* § 51, at 485 (1963). Civil Rule 23.2 allows a plaintiff to sue representative members of an unincorporated as-

---

**17.** It is also of significance to us that the punitive damages issue was raised at the very last possible moment and AMP did object to instructing the jury on punitive damages. That AMP failed to notice that the instruction erroneously lacked the clear and convincing evidence standard is understandable given the plaintiff's untimely proffer of the proposed instruction.

**18.** We note in passing that the trial court did not abuse its broad discretion in allowing Hendsch to present his punitive damages claim to the jury. We will not reverse such a decision unless we have a "definite and firm conviction upon review of the entire record that the court was mistaken." *Vertecs Corp. v. Reichhold Chems., Inc.,* 671 P.2d 1273, 1277 (Alaska 1983).

sociation as a class. *See also* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra* § 1861, at 215. However, these are merely permissive rules; the plaintiff remains free to sue the entity, the members, or a class of members. *See* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra* § 1861, at 214–16.

A court may not adjudicate the rights of a person or entity that is not a party to the action before it. *Williams v. City of Valdez*, 603 P.2d 483, 492 (Alaska 1979). Even if we were to assume that all of the individual members of AMP could be held liable for AMP's actions, Hendsch's complaint did not name them as defendants. By way of illustration, an employer can be held liable for certain torts committed by his or her employees. *See, e.g., State v. Will*, 807 P.2d 467, 471 (Alaska 1991). But a complaint that fails to name the employer as a party cannot result in a judgment against anyone but the employee. For a legally responsible party to be held liable for damages, the plaintiff must name that party in the lawsuit. *See, e.g., Fazzi v. Peters*, 68 Cal.2d 590, 68 Cal.Rptr. 170, 440 P.2d 242, 245 (1968) (plaintiff could collect on partnership's assets but not assets of individual partners when only partnership was named in complaint), *cited with approval in Williams*, 603 P.2d at 492 n. 29; *Fuqua v. Taylor*, 683 S.W.2d 735, 738 (Tex.App.1984) (in action for constructive trust, only named parties entitled to judgment); 59A Am.Jur.2d, *Partnership* § 767, at 616 (1987) (actions against partnership not enforceable against partners not served or joined in suit).[19] We conclude that a final judgment may be rendered only against the parties named in the complaint and for acts alleged in the complaint as to those parties.

## IV. CONCLUSION

The trial court is AFFIRMED in part and REVERSED in part, and the matter is REMANDED for proceedings consistent with this opinion:

The trial court's denial of the motion for continuance is AFFIRMED.

The trial court's determination that AS 08.62.175(c)(4) implies a private right of action, and that the jury should be instructed that the statute had been violated in this case, is AFFIRMED.

The judgment against AMP for intentional interference with prospective economic advantage is REVERSED with the direction to dismiss that cause of action.

The verdict concerning allocation of expenses is AFFIRMED.

The verdict awarding $12,001 for breach of the covenant of good faith and fair dealing is AFFIRMED.

The award of punitive damages is VACATED, and the matter REMANDED for retrial with the instruction that punitive damages must be proved by clear and convincing evidence.

The judgment against Boyd, Schibel, Jacobsen and Murphy individually for AMP's actions is REVERSED.

19. We recognize that these authorities deal with partnerships and joint ventures. Nonetheless, we find them highly persuasive. We do not express an opinion as to whether AMP is properly classified as an unincorporated association or a partnership. If anything, the case for liability of partners for obligations of the partnership is even stronger than that for liability of members for obligations of an association. *See* David J. Oliveiri, Annotation, *Liability of Member of Unincorporated Association for Tortious Acts of Associ-* *ation's Nonmember Agent or Employee*, 62 A.L.R.3d 1165, 1168 (1975) (noting that many jurisdictions hold members of unincorporated associations liable only for torts they participated in or approved of). But even partners are entitled to notice and an opportunity to argue their case before being held individually liable for obligations of the partnership. Thus, regardless of AMP's organizational status, Boyd, Schibel, Murphy, and Jacobsen cannot be held individually liable.