**Michael HOLLAND, Appellant,**

v.

**UNION OIL COMPANY OF CALIFORNIA, INC.,**
**Appellee.**

No. S–8273.

Supreme Court of Alaska.

Dec. 23, 1999.

Rehearing Denied Feb. 2, 2000.

**36.** 424 U.S. at 334–35, 96 S.Ct. 893.

**37.** *See supra* Part III.B.1.

Jeffrey A. Friedman, Friedman, Rubin & White, and Terry A. Venneberg, Anchorage, for Appellant.

William F. Mede and Gregory S. Fisher, Owens & Turner, P.C., Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

COMPTON, Justice.

### I. INTRODUCTION

Union Oil Company of Alaska (Unocal) demoted Michael Holland for committing a significant error in judgment involving an ethical issue. Holland allegedly asked a subordinate contractor to work on a personal project during work hours and instructed him to use plant materials. Unocal based its decision to demote Holland on information that it gathered during interviews with Holland and four other individuals. Holland sued Unocal for, among other things, breach of contract and breach of the implied covenant of good faith and fair dealing. The superior court granted Unocal summary judgment on all grounds, concluding that Holland was an "at-will" employee and that Unocal did not breach the implied covenant of good faith and fair dealing. We affirm.

### II. FACTS AND PROCEEDINGS

Michael Holland began working as a Utilityman for Unocal in February 1980. He was promoted to the position of "A" Mechanic, and then to the position of Field Foreman.

On May 22, 1995, Charles H. Ross, Holland's supervisor, called Holland into his office to discuss reports of Holland's alleged misconduct. Larry Woods, Unocal's Loss

Control Manager, was present at the meeting.[1] Ross and Woods asked Holland about his plans to make boat pads for Mark Epperheimer. Boat pads are "devices lining a boat's engine compartment for the purpose of muffling noise and filtering smoke and debris." Epperheimer's company did contract work for Unocal, though Epperheimer was not a Unocal employee. Holland stated that Epperheimer had approached him and asked him "to make some stuff ... [but Holland stated that] we were going to charge him ... he was going to buy the material." According to Holland, he spoke to Richard Rogers, another subordinate contractor, about making the pads for Epperheimer. But Holland stated that he had never told Rogers to go out to Epperheimer's boat and was not aware that Rogers had done so during work hours. Rogers testified in an affidavit however, that Holland had told him that "[Epperheimer] had a project for us to do at his shop. Go down there, and take care of whatever he needed done." Further, Holland told Ross and Woods that the boat pads were never made.

Ross called Holland back into his office the next morning to further discuss the allegations. Holland maintained that Rogers was going to make the boat pads on his own time and that Epperheimer was going to pay for the materials used. Holland reiterated, and Ross and Woods accepted, that Holland and Rogers had not made the pads for Epperheimer. Holland did admit, however, that his actions "come[ ] under poor judgment, I guess, because I didn't shine [Epperheimer] on, ... I should have [written] a proposal and gone that route, and we could've traded [Epperheimer] for it, you know, labor on things that we've done on other things. There was no gain on my part from [Epperheimer], you know."

On May 24, 1995, Ross issued a memorandum to Holland stating that "[d]ue to a significant error in judgment involving an ethics issue while dealing with a Contractor, effec-

tive May 25, 1995[,] Mike Holland will be an A mechanic in Group III." The demotion reduced Holland's salary by approximately $20,000.

In October 1995 Holland filed a complaint with the Alaska State Commission for Human Rights (Commission). Holland alleged that, by demoting him, Unocal had discriminated against him "on the basis of [his] disability, Dyslexia." After an investigation, the Commission concluded that Holland's allegations were not supported by substantial evidence. Holland did not appeal.

In August 1996 Holland sued Unocal and Ross for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. Holland sought at least $100,000 in compensatory and punitive damages. In November Holland amended his complaint to allege defamation. In January 1997 Holland stipulated to a dismissal of his claims of intentional infliction of emotional distress and defamation. This stipulation "had the consequence of dismissing Ross from the litigation." Holland amended his complaint for a second time to allege a second breach-of-contract claim based on Unocal's alleged failure "to adhere to provisions set out in its Human Resources Policies and Procedures Manual concerning employee discipline."

Holland moved for partial summary judgment on his claim that "Unocal breached its contract of employment with [him] by demoting him without just cause." Holland alleged that he had relied on a March 9, 1995, memorandum from Unocal to all employees saying that "dealing with substandard conduct will be through a system of progressive discipline." The superior court concluded that this phrase did not convert Holland's "at-will" employment relationship to one requiring Unocal to have "just cause" to demote him. Further, the court concluded that even if the memo had created a "just cause" em-

---

1. Also on May 22 Woods and Ross interviewed Jeff Laube, a Unocal employee; Jay Weston, Laube's supervisor; Richard Rogers, a subordinate contractor; and Mark Epperheimer. Epperheimer signed a statement that says in its entirety:

> In my interest, hours and perhaps materials were expended by Unocal toward fixtures for my boat.
> I agree to reimburse Unocal for sums felt reasonable by Unocal management.

ployment relationship, Unocal had had "just cause" to demote Holland. The court stated:

> The establishment of a policy, process or general guideline when no real limit is placed upon the employer's discretion to administer discipline for substandard conduct does not convert an "at will" relationship to a "just cause" relationship. Further, the court notes that there is no representation in the March memo that an employee could only be demoted or disciplined for "just cause." Even if the relationship between Unocal and Holland could be described as one requiring "just cause" before demotion, there are no material issues of fact advanced by Holland which could militate against summary judgment in favor of Unocal. Based on Holland's own admissions, the demotion was justified.

Unocal moved for summary judgment on Holland's breach of implied covenant of good faith and fair dealing claim. "Absent evidence that Holland could be demoted only for just cause," the court said, "the inquiry is whether Unocal acted illegally or in bad faith or whether the decision it made was arbitrary or capricious." The court found "no basis for the court or a jury to substitute its judgment for that of Unocal." It dismissed as "parsimonious at best ... almost nonexistent" the evidence that Holland had submitted that he had been treated differently than other Unocal employees. The court granted Unocal summary judgment on all of Holland's remaining claims. Holland appeals.

Holland has briefed three points on appeal: (1) whether the March 9, 1995, memo created a for-cause employment relationship; (2) whether Unocal had cause to demote Holland; and (3) whether Unocal breached the implied covenant of good faith and fair dealing. While Holland does not appear to argue that Unocal breached the implied covenant of good faith and fair dealing as an alternative to this claim that he was a "for-cause" employee, his claim must be treated as such.[2]

## III. DISCUSSION

### A. Standard of Review

■ We review the superior court's grant of summary judgment de novo.[3] We will affirm summary judgment if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law.[4] The non-moving party is entitled to have the record reviewed in the light most favorable to it and to have all reasonable inferences drawn in its favor.[5]

### B. Unocal Did Not Create and Then Breach a "For–Cause" Employment Relationship.

■ On March 9, 1995, Unocal circulated and posted a memorandum to "All Employees" regarding "Kenai Plant Work Rules Policy." The memorandum stated in part:

> Certain conduct cannot be permitted to occur and can result in disciplinary action. In most instances dealing with substandard conduct will be through a system of progressive discipline up to and including termination. The merits of the violation will be investigated and a decision regarding appropriate disciplinary action will be based on the facts. In some instances, depending on the rule violated, certain steps in the progressive discipline system may be bypassed. Examples of such conduct include, but are not limited to, the following:
>
> • Theft, or unauthorized use or possession of Company property.
>
> • Falsification of Company records, the making of false statements to supervision or other dishonesty.
>
> . . . .

---

**2.** See Luedtke v. Nabors Alaska Drilling, Inc., 768 P.2d 1123, 1131 (Alaska 1989) ("Employees hired on an at-will basis can be fired for any reason that does not violate the implied covenant of good faith and fair dealing. However, employees hired for a specific term may not be discharged before the expiration of the term except for good cause.").

**3.** See Nielson v. Benton, 903 P.2d 1049, 1052 (Alaska 1995).

**4.** See In re Estate of Evans, 901 P.2d 1138, 1140 (Alaska 1995).

**5.** See Metcalfe Invs., Inc. v. Garrison, 919 P.2d 1356, 1360 (Alaska 1996) (citing Wilson v. Pollet, 416 P.2d 381, 381–84 (Alaska 1966)).

• Conducting personal business on Company property.

Holland argues that the March memo changed his "at-will" employment relationship to one requiring Unocal to have "just cause" to demote him. He states that "[t]his memo tells Unocal employees ... that discipline would be imposed only after an investigation establishes a factual basis for the disciplinary action. It also indicates [that] there must be some sort of 'violation' before discipline is imposed. In other words, [Unocal employees] will only be disciplined 'for cause.'" Holland cites *Jones v. Central Peninsula General Hospital*[6] and *Parker v. Mat–Su Council on Prevention of Alcoholism & Drug Abuse*[7] in support of his argument. While Holland concedes that the memo does not specifically state that employees are terminable only "for cause," he argues that the memo's language "limit[s] [Unocal] to imposing discipline only when the established facts show substandard conduct or show a rule violation." Holland argues that, because the memo says that discipline will be imposed where facts establish "substandard conduct" or a rule violation, Unocal may impose discipline *only* if there has been substandard conduct, and may not impose discipline "at will."

Unocal, however, argues that

[t]he March 9, 1995 memo did not create a "just cause" relationship. It did not obligate Unocal to follow any procedure. The memo did not promise that progressive discipline would always be followed. Unocal expressly retained discretion under the memo's terms to impose more or less severe discipline depending upon the circumstances and to entirely bypass progressive discipline if it deemed such action appropriate.

Unocal cites to many cases in other jurisdictions to support its argument. Additionally,

Unocal argues that Holland's claim that the memo established a "just cause" employment relationship because the memo mentioned an investigation should be rejected.

We find Holland's argument unpersuasive and conclude that the memo did not modify Holland's "at-will" employment relationship, changing it to one where Unocal could only demote him "for cause." Our case law is in accord with this holding.

In *Jones*, Central Peninsula General Hospital (CPGH) employed Jones as a registered nurse.[8] Because she "had no contract for a specific length of employment," Lutheran Hospitals and Homes Society (LHHS), which operated CPGH, "issued a personnel policy manual which, among other things, provided for termination for cause and a grievance procedure for all employees."[9] After Jones was promoted to nurse supervisor, LHHS issued a second personnel policy manual that "exempted supervisory employees from the grievance procedures, but provided that all non-probationary employees would be terminable only for good cause."[10] The second policy manual consisted of "[eighty-five] pages of detailed text covering polices, rules, regulations, and definitions."[11] LHHS terminated Jones and did not let her file a grievance because she, according to LHHS, was terminable at will.[12] Jones sued LHHS and CPGH, arguing that "the [first] personnel policy manual ... modified the terms of her at-will employment, and bound [LHHS] to the policies and procedures in the manual," and that the second personnel policy manual provided that she could only be terminated for cause.[13]

We held that "employee policy manuals may modify at-will employment agreements, and that whether a given manual has modified an at-will employment agreement must be determined on the particular facts of each case."[14] We concluded that the second poli-

**6.** 779 P.2d 783 (Alaska 1989).

**7.** 813 P.2d 665 (Alaska 1991).

**8.** *See Jones,* 779 P.2d at 784.

**9.** *Id.* at 785.

**10.** *Id.*

**11.** *Id.* at 788.

**12.** *See id.* at 785.

**13.** *Id.*

**14.** *Id.* at 787.

cy manual superseded the first and "was incorporated into Jones' at-will employment agreement." [15] We stated that, despite a disclaimer on the first page of the manual that said that it was "not a contract of employment nor is it incorporated in any contract of employment between [LHHS] and any employee," the manual was incorporated into Jones's employment contract.[16] The manual "create[d] the impression, contrary to the 'disclaimer,' that employees are to be provided with certain job protections." [17] We stated that "[e]mployers should not be allowed to 'instill … reasonable expectations of job security' in employees, and then withdraw the basis for those expectations when the employee's performance is no longer desired." [18]

In *Parker*, the Mat–Su Council on Prevention of Alcohol and Drug Abuse (Mat–Su) employed Parker as a substance abuse counselor.[19] Parker and Mat–Su had no employment contract; rather, Mat–Su gave her a personnel manual that "outline[d] various disciplinary policies and procedures and provide[d] that involuntary termination will occur only for cause." [20] Mat–Su terminated Parker after she had refused to resign or take sick leave (and then return to work on probationary status) while she had a contagious illness.[21] Parker sued, claiming that "in taking disciplinary action against her, Mat–Su did not comply with its personnel manual. Consequently, … her termination constituted a breach of her employment contract." [22] Citing *Jones*, we stated that

"[w]hen the provisions of a personnel manual create the reasonable expectation that employees have been granted certain rights, the employer is bound by the representations contained in those provisions." [23] Because Mat–Su did not seriously challenge Parker's assertion that the manual applied to her, this court concluded that "the personnel manual did modify Parker's employment agreement." [24] We noted, however, that "generally it is a question of fact whether the manual did modify the employment agreement." [25]

*Jones* and *Parker* do not control the instant case. In both *Jones* and *Parker*, the personnel manuals specifically stated that an employee would only be terminated for cause.[26] Because the memo did not specifically state that a Unocal employee can be terminated only for good cause, *Parker* and *Jones* do not compel the conclusion that the memo modified Holland's "at-will" employment contract.

As we stated in *Jones*, we must look at the particular facts of each case to determine whether the memo gave Holland a reasonable expectation that he would only be demoted or terminated "for cause." [27] Because it is "generally … a question of fact whether the manual did modify the employment agreement," this court should only conclude, as a matter of law, that the memo did not create a "just cause" employment relationship, if no reasonable juror could conclude that it did.[28]

15. *Id.*

16. *Id.*

17. *Id.* at 788.

18. *Id.* (quoting *Leikvold v. Valley View Community Hosp.*, 141 Ariz. 544, 688 P.2d 170, 174 (1984)) (alteration in original).

19. *See Parker v. Mat–Su Council on Prevention of Alcoholism & Drug Abuse*, 813 P.2d 665, 665 (Alaska 1991).

20. *Id.* at 665–66.

21. *See id.* at 666.

22. *Id.*

23. *Id.*

24. *Id.* at 667.

25. *Id.* at 666–67.

26. *See id.* at 666 ("[The] personnel manual … outlines various disciplinary policies and procedures and provides that involuntary termination will occur only for cause."); *Jones v. Central Peninsula Gen. Hosp.*, 779 P.2d 783, 785 (Alaska 1989) ("The [second] manual exempted supervisory employees from the grievance procedures, but provided that all non-probationary employees would be terminable only for good cause.").

27. *Jones*, 779 P.2d at 787.

28. *Parker*, 813 P.2d at 666 (citing *Jones*, 779 P.2d at 788). *See also Drobny v. Boeing Co.*, 80 Wash. App. 97, 907 P.2d 299, 302 (1995) ("Whether or not an employer has made a promise specific

The memo was one page. The memo, read in its entirety, says: that Unocal will not permit certain conduct at the plant; if such conduct takes place, Unocal will likely deal with the employee through a system of progressive discipline; that Unocal will investigate the allegations; that Unocal will base any disciplinary action on the facts; and that Unocal has discretion to skip any steps in the progressive disciplinary system. In a non-exclusive list, Unocal gives twenty-four examples of conduct not permitted at the Kenai plant. The memo merely addresses some potential behavior problems, notifies the employees that such conduct is not permitted, and tells them what may, or may not, happen if such conduct takes place. The memo contains the following hedging terms: "can result," "[i]n most instances," "[i]n some instances," "steps in the progressive discipline system may be bypassed." This language does not bind Unocal to any disciplinary procedure, nor does the non-exclusive list of prohibited conduct limit what an employee could be disciplined for. Holland argues that the memo's sentence—"In most instances dealing with substandard conduct will be through a system of progressive discipline up to and including termination"—implies that *only* substandard conduct will be disciplined. That, however, is not what the memo states. Rather, the memo simply tells Unocal employees what may happen if substandard conduct does occur.

·The memo presents a non-exclusive overview of its subject and creates no binding obligations on Unocal. We conclude that, as a matter of law, the memo could not "create [a] reasonable expectation that employees have been granted certain rights."[29] Such a conclusion is consistent with holdings by other courts.[30]

### C. Unocal Did Not Breach the Covenant of Good Faith and Fair Dealing When It Demoted Holland.

 This court has "recognized a covenant of good faith and fair dealing in all at-will employment contracts."[31] "This covenant does not lend itself to precise definition, but it requires at a minimum that an employer not impair the right of an employee to receive the benefits of the employment agreement."[32] We have also stated that "[t]his covenant ... requires that an employer treat like employees alike."[33] "The covenant of good faith and fair dealing ... includes an objective standard, under which the employer must 'act in a manner which a reasonable person would regard as fair.' "[34] The covenant also includes a subjective element. "An employer engages in subjective bad faith when it discharges an employee for the purpose of depriving him or her of one of the benefits of the contract."[35]

We have held that whether an employer breached the covenant of good faith and fair dealing is usually a question for the trier of fact.[36] We have not held, however, that we could never conclude that as a matter of law

---

enough to create an obligation and justify an employee's reliance thereon is a question of fact. Only if reasonable minds could not differ in resolving this issue should a trial court decide it as a matter of law.") (citations omitted).

29. *Parker*, 813 P.2d at 666.

30. *See, e.g., Rood v. General Dynamics Corp.*, 444 Mich. 107, 507 N.W.2d 591, 607–08 (1993) (holding that an employee handbook that contained "no mandatory provisions or specific procedures[ ] regarding employee discharge ... [was] insufficient to permit a reasonable inference that [the employer] intended to give up its right to discharge employees at will"); *Drobny*, 907 P.2d at 304 (stating that " '[f]or cause' and 'just cause' remain terms of art in the employment context.... [And the words] 'serious' or 'intentional' do not incorporate a promise of termination only 'for cause' into an employment manual").

31. *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1223 (Alaska 1992) (*Luedtke II*); *see also, e.g., Rutledge v. Alyeska Pipeline Serv. Co.*, 727 P.2d 1050, 1056 (Alaska 1986); *Mitford v. de Lasala*, 666 P.2d 1000, 1007 (Alaska 1983).

32. *Jones*, 779 P.2d at 789.

33. *Id.* at 789 n. 6.

34. *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997) (quoting *Luedtke II*, 834 P.2d at 1224).

35. *Id.*

36. *See Luedtke II*, 834 P.2d at 1223.

an employer did not breach the implied covenant of good faith and fair dealing when it demoted an employee.

Holland argues that Unocal breached its covenant of good faith and fair dealing because it punished him for merely thinking about doing something that other employees actually did without being punished. He appears to be basing his argument on two different theories: (1) by demoting him for thinking about making the boat pads, while others at the plant actually engaged in similar projects without being disciplined, Unocal treated him differently than "like" employees; and (2) demoting him for merely thinking about making the boat pads is objectively unfair because he planned to ask the supervisor for permission, but never had the chance. We address each of Holland's arguments in turn.

1. *Unocal did not breach the covenant of good faith and fair dealing, because it did not treat Holland differently than "like" Unocal employees.*

■ Holland's argument can be summed up as follows: "Holland was punished for thinking about doing what others actually did without being punished. Reasonable jurors could conclude that this is not treating like employees alike." Unocal, however, argues that "Holland never adduced any evidence that the other [employees'] conduct was 'the same or nearly the same' as his boat pad project." Further, Unocal argues, Holland conceded that the other projects discussed during his deposition were not "like his boat pad project, [and thus he] may not now claim anything to the contrary." Holland's project also differed from other personal projects because "there was no accountability or supervisory oversight for Holland's boat pad project." Additionally, Unocal asserts that for Holland to prevail "on his breach of covenant claim that Unocal did not treat like employees alike, Holland must also establish that at the time Unocal made the demotion decision Unocal knew of other similarly situated employees who had committed similar misconduct yet were not disciplined." Holland, Unocal claims, "has not established [that] Unocal management knew of any other

similar misconduct when it demoted him in May 1995."

It is undisputed that Unocal permits small personal projects to be done at the plant. These projects are called G-jobs, short for government jobs. Rogers characterized a G-job as one that "doesn't have a Work Order affiliated to it, and a charge number affiliated to it." It is also undisputed that other Unocal employees, and contractors working for Unocal, had made personal items without being investigated and/or disciplined. Holland asserts that the fact that other Unocal employees made personal items during working hours, and used Unocal materials, but were not disciplined, is proof that he was treated unlike like employees. Holland lists two specific incidents to support his argument: (1) Rogers made a boat tarp for Fred Werth, Holland's direct supervisor; and (2) "Plant Manager Bill White used company time and materials to have some duct work done for [Rogers's] house." It is undisputed that Unocal employees or contractors made these two items at the plant.

In 1993 Werth asked Rogers if he was interested in making a cover for his boat. Rogers stated that he agreed to come in on his own time and make the tarp. He spent eight to ten hours making the boat tarp for Werth. Werth paid him $150 for the work. Rogers used scrap material to make the boat tarp. Two people from the Unocal home office investigated the boat tarp project. They asked Werth questions about what material was used to make the tarp, the size of it, and the time expended in making it. Werth was never disciplined for asking Rogers to make the tarp.

Regarding the duct work done for Rogers, Bill White stated that he

was helping [Rogers] install a furnace and we ... found that we didn't have a transitional piece called the plenum ... where the furnace hooks to the ducting, and needed one ... so I did a sketch and asked the shop to make us one, and so they made a piece of sheet metal called a plenum from my sketch.

White stated that the project cost less than $100 and took about an hour or two to complete. This project was never investigated

and no one was ever disciplined for making the duct work for Rogers.

Rogers stated that the boat pad project would take "probably 80 hours ... 8, 10–hour days of cutting and sewing, to finish the project." Rogers also estimated that $8,000–$10,000 worth of material would be used to make the boat pads. While Holland stated that he believed the boat pad project to be "something ... small," he agreed that, because the project involved doing work for an outside contractor, he needed to get Unocal's permission to make the boat pads.

The record supports the conclusion that, as a matter of law, Holland was not treated differently from like Unocal employees, and, therefore, Unocal did not breach the covenant of good faith and fair dealing based on this argument. Holland's project was simply not like the other apparently insignificant projects done at the plant. The boat pad project would have required significantly more time and more materials than the other projects. Holland's boat pad project, therefore, would have cost Unocal significantly more money. While Holland claims to have been unaware of the amount of time and money it would cost to make the boat pads, that does not negate actual expenses that Unocal avoided incurring by investigating the reports that preparations were being made to make the boat pads.

2. *Unocal did not act objectively unfairly by demoting Holland for merely thinking about making the boat pads.*

 Holland argues that "[his] inten[t] to obtain approval if he had decided to allow the boat pad project to go forward is uncontradicted." Holland also claims that he did not tell Rogers to measure Epperheimer's boat; rather, Rogers went out on his own and did so. Further, Holland argues that he had not yet decided whether he was going to do the boat pad project. Holland argues that, if the jury decides that he did not authorize any work on the project, "it could reasonably

conclude he was treated unfairly when he was disciplined for merely considering the project." Thus, Holland argues that, because a reasonable jury could conclude that it was objectively unfair to demote him for something he only thought about doing, Unocal is not entitled to summary judgment on this issue.

While there is limited precedent to help us decide whether Unocal is entitled to a judgment as a matter of law that it did not breach the covenant of good faith and fair dealing, a brief overview of decisions offers some guidance.

In *Luedtke II* [37] and in *Alaska Marine Pilots v. Hendsch,* [38] we concluded that the employer had violated the covenant of good faith and fair dealing. In *Luedtke II,* we concluded that the employer acted objectively unfairly, and thus breached the covenant of good faith and fair dealing, because uncontradicted evidence showed that it tested Luedtke "for drug use without prior notice, ... no other employee was similarly tested, and ... [it] suspended Luedtke immediately upon learning of the results of the test." [39] We concluded that, because drug testing added additional terms to an employment contract, an employee must be given notice of that additional term so that he may respond to it, and Nabors's failure to give such notice was objectively unfair to Luedtke. [40] In *Hendsch,* we stated that a reasonable jury could conclude that Alaska Marine Pilots breached the covenant of good faith and fair dealing by terminating Hendsch's contract without thirty-days notice as called for by the contract. [41] Additionally, we concluded that, in view of contractually provided procedural protections, a reasonable jury could "have found that [the employer's] failure to consult other pilots violated the implied covenant that such consultations would occur prior to termination. [They] could have found these actions to be unreasonable and unfair." [42]

---

**37.** *Id.*

**38.** 950 P.2d 98 (Alaska 1997).

**39.** *Luedtke II,* 834 P.2d at 1225–26.

**40.** *See id.* at 1226.

**41.** *See Hendsch,* 950 P.2d at 101, 109.

**42.** *Id.*

On the other hand, we denied the employees' breach claims in *Jones v. Central Peninsula General Hospital*[43] and in *Ramsey v. City of Sand Point.*[44] In *Jones*, we held that the employer did not violate the implied covenant of good faith and fair dealing because the policy manual clearly "exclude[d] supervisory personnel from grievance procedures."[45] Jones, who was a nurse supervisor, had "not been denied any benefit of her employment agreement."[46] Therefore, we held that the employer did not violate the implied covenant of good faith and fair dealing.[47] In *Ramsey*, Ramsey's contract "authorized the City to terminate him for any reason whatsoever, so long as it paid him an additional six months' salary as severance pay."[48] Because the "covenant of good faith cannot be interpreted to prohibit what is expressly permitted by Ramsey's contract with the City," this court concluded that, "as a matter of law, a jury could not find the City's termination without an investigation violated the implied covenant."[49]

The instant case can be distinguished from all of the above. Unlike the public policy context which highlighted *Luedtke II*, there is no public policy reason for finding that Unocal acted objectively unfairly when it demoted Holland, based on reports that he had participated in an unauthorized project. Furthermore, unlike the employer ignoring its own written contract provision in *Hendsch*, Holland does not assert that Unocal acted objectively unfairly by failing to follow its own procedures. This case is not any more closely related to the cases where this court found, as a matter of law, that the employer did not breach the covenant of good faith and fair dealing. On the other hand, unlike *Ramsey* and *Jones*, no provision in Holland's contract provides that Unocal may not demote him because he contemplated making an unauthorized project. Accordingly, we conclude that a reasonable jury

could not find that Unocal breached the covenant of good faith and fair dealing when it demoted Holland.

Holland denies that he did anything wrong. Holland asserts that he was merely thinking about making the boat pads and was planning to ask permission, that he mentioned it to Rogers, and that Rogers went off on his own to measure Epperheimer's boat during work hours, without Holland's knowledge.

As discussed above, Ross and Woods investigated the charges against Holland. They interviewed all of the parties involved and concluded that Holland was not telling the truth and thus demoted him for using poor judgment, a lapse Holland admits. Therefore, Unocal's actions, as a matter of law, could not reasonably be considered objectively unfair. The California Court of Appeal addressed a similar issue in *Burton v. Security Pacific National Bank,* stating:

[The employee] denied the charge, and [employer] chose to believe other witnesses and to reject [employee's] version. This raises no inference of bad faith on [the employer's] part. This type of situation is very common; an employee charged with misconduct denies committing the misconduct. If the employer makes a determination in good faith that the misconduct occurred, there is no breach of the implied covenant of good faith and fair dealing, even if the employee could subsequently prove that the factual finding of misconduct was a mistake. If the law were otherwise, no employment contract could be "at will".... If the employee were entitled to jury trial for breach of the implied covenant of good faith and fair dealing merely by asserting that the charged misconduct was not true, the decision to terminate would be at the discretion of a jury, not the employer. The law of employment

**43.** 779 P.2d 783 (Alaska 1989).

**44.** 936 P.2d 126 (Alaska 1997).

**45.** *Jones,* 779 P.2d at 789.

**46.** *Id.*

**47.** *See id.*

**48.** *Ramsey,* 936 P.2d at 133.

**49.** *Id.*

contracts would be turned on its head.[50]

We find this reasoning persuasive.

We have stated that "it is possible for an employer to rightfully terminate an employee but to do so in a way that violates the covenant of good faith and fair dealing."[51] In such a case, we stated, damages would be "limited to those that flow from the breach of the covenant and cannot include the damages an employee would be entitled to if the employee had been wrongfully terminated."[52] *Hendsch* permits the conclusion that an employee's denial of wrongdoing does not, without more, create a triable issue of fact in the context of a claim for breach of the implied covenant of good faith and fair dealing.

In *Hendsch* the jury found that the employer (Boyd) had rightfully terminated Hendsch for economic reasons, yet also found that Boyd had breached the covenant of good faith and fair dealing.[53] We stated that

> the jury could have reasonably concluded that although it was proper for Boyd to terminate Hendsch, it was not proper to do so without thirty days' notice. The jury could have found that terminating the contract without notice constituted a breach of the covenant of good faith and fair dealing. In addition, the contract provided procedural protection for pilots if they were suspended. The jury could have found that Boyd's failure to consult other pilots violated the implied covenant that such consultations would occur prior to termination. The jury could have found these actions to be unreasonable and unfair.[54]

Implicit in our decision that the jury could find that Boyd properly terminated Hendsch, but that Boyd breached the covenant of good faith and fair dealing, was our conclusion that the jury could have reasonably found that the employer had acted unfairly in the process of terminating Hendsch, i.e., that Boyd did not give Hendsch proper notice and did not consult other pilots before terminating him. Both the duty to give notice and the duty to

consult were arguably required by specific provisions of the employment contract.

■■■■ In the instant case, Holland offers no evidence that Unocal improperly investigated his alleged wrongdoing, or that Unocal was unfair in reaching its conclusion. Rather, Holland merely asserts that he did not engage in the alleged misconduct and, therefore, demoting him was objectively unfair. For the reasons given by the California Court of Appeal, we hold that, as a matter of law, Holland's mere denial of wrongdoing is insufficient to state a claim that Unocal breached the covenant of good faith and fair dealing. While it may be "objectively unfair" to demote employees for misconduct they did not in fact commit, the covenant of good faith and fair dealing should not be extended to grant a jury trial to all "at-will" employees who contend they did nothing wrong. Furthermore, it is not unfair for an employer to disbelieve, in good faith, an employee's version of events, or to prevent proscribed conduct before it occurs.

Given Holland's failure to adduce facts reasonably permitting an inference that Unocal acted in any objectively unfair manner, we conclude that Holland's mere denial of any wrongdoing is insufficient in and of itself to avoid summary judgment on his claim that Unocal breached the implied covenant of good faith and fair dealing.

## IV. *CONCLUSION*

We conclude that the Unocal memo did not modify Holland's "at-will" employment contract and, as a matter of law, Unocal did not breach the implied covenant of good faith and fair dealing.

The judgment of the superior court is AFFIRMED.

**50.** 197 Cal.App.3d 972, 243 Cal.Rptr. 277, 281 (1988).

**51.** *Hendsch,* 950 P.2d at 109.

**52.** *Id.*

**53.** *Id.* at 103.

**54.** *Id.* at 109.