WHITTIER PROPERTIES, INC., Appellant,

v.

ALASKA NATIONAL INSURANCE COMPANY, Appellee.

No. S–12538.

Supreme Court of Alaska.

June 13, 2008.

---

George R. Lyle, Guess & Rudd P.C., Anchorage, for Appellant.

Brewster H. Jamieson and Andrea E. Girolamo–Welp, Lane Powell LLC, Anchorage, for Appellee.

Randall J. Weddle, Holmes Weddle & Barcott P.C., Anchorage, and Laura A. Foggan, John C. Yang, and Benjamin J. Theisman, Wiley Rein LLP, Washington, D.C., for Amicus Curiae Complex Insurance Claims Litigation Association.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Is gasoline that leaked from the broken fill pipe of an underground storage tank a "pollutant" within the meaning of the "absolute" pollution exclusion contained in the tank owner's commercial liability insurance policies? We conclude that it is, that the policies' pollution exclusions unambiguously excluded property damage arising out of the escape of gasoline, and that other policy provisions do not restore or otherwise provide coverage. We therefore affirm the summary judgment entered for the insurer, Alaska National Insurance Company, against the insured, Whittier Properties, Inc.

## II. FACTS AND PROCEEDINGS

Whittier Properties, Inc. owned and operated a Zipmart gas station and convenience store near Sterling from 1990 to 2000. In August 1995 Whittier closed the station's two 10,000 gallon underground storage tanks (USTs) and installed a new 20,000 gallon, three-compartment UST. When Whittier's contractor installed the new UST it noticed soil contamination. Although the Alaska Department of Environmental Conservation (ADEC) notified Whittier that it should perform clean up, Whittier did not comply with ADEC's notice.

Alaska National Insurance Company (ANIC) issued Whittier five commercial general liability insurance policies at relevant times, providing liability coverage from May 29, 1996 to May 29, 2001.[1] Coverage A of each policy covers bodily injury and property damage. Each policy also contains a pollution exclusion for property damage arising out of "discharge, dispersal, seepage, migration, release or escape of pollutants." Each policy defines a "pollutant" as "any solid, liquid, gaseous or thermal irritant or contam-

inant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

In December 1999 Whittier also obtained a federally required "Storage Tank System Third–Party Liability and Corrective Action Policy" from Zurich American Insurance Company.[2] The Zurich policy provided coverage retroactive to 1997. The application for the Zurich policy asked Whittier "[d]o you currently have pollution coverage for the tanks" listed in the application; Whittier replied "NO."

In December 2000 Whittier closed its Zipmart gas station. In December 2001 environmental specialists investigated the site and found nearly a foot of free gasoline floating on the groundwater. ADEC hired Statewide Petroleum Service to inspect Whittier's UST; in February 2003 Statewide discovered that the vertical fill pipe for one compartment of the new UST was broken.

The Alaska Attorney General commissioned an analysis of Whittier's fuel inventory records in April 2003. The analysis disclosed that the fill pipe first broke in February 1997, that the break diminished in size from October 1997 to January 1998, and that the break reopened in February 1998. The analysis also determined that at least 50,800 gallons of gasoline were lost from the time the fill pipe broke in 1997 until Whittier closed the gas station in 2000.

Some of Whittier's neighbors filed three lawsuits against Whittier in 2003 and early 2004 for compensatory and punitive damages allegedly resulting from leaked gasoline entering their properties.

In February 2004 Whittier tendered defense and indemnity for the three claims to ANIC under two of ANIC's policies (98E PS 54321 and 99E PS 54321) and requested copies of two other policies (96E PS 54321 and 97E PS 54321). ANIC initially expressed

1. Policy 96E PS 54321 was effective May 29, 1996 to May 29, 1997; Policy 97E PS 54321 was effective May 29, 1997 to May 29, 1998; Policy 98E PS 54321 was effective May 29, 1998 to May 29, 1999; Policy 99E PS 54321 was effective May 29, 1999 to May 29, 2000; and Policy 00E PS 54321 was effective May 29, 2000 to May 29, 2001.

2. The Zurich policy was the subject of unrelated litigation brought against Whittier in 2004 arising from the same leaked gasoline at issue in this case. *See Zurich Am. Ins. Co. v. Whittier Props. Inc.*, 356 F.3d 1132 (9th Cir.2004).

doubt that the claims were within the policies' coverage, but later stated that ANIC would "carefully review" the claims. Later that month Whittier also tendered defense and indemnity for the claims under policies 96E PS 54321 and 97E PS 54321. In March Whittier tendered defense and indemnity for the claims under the fifth ANIC policy, 00E PS 54321.

In May 2004 ANIC informed Whittier that it had reviewed the lawsuits and policies and determined that there was "no potential for coverage under the policies and no duty on the part of ANIC to defend the[ ] lawsuits." ANIC explained that gasoline that leaked from the UST fell within the pollution exclusion in each of the ANIC policies.

From May 2004 to May 2005 neighbors filed four more lawsuits against Whittier for damage to their land caused by the leaked gasoline. One of those neighbors, Sterling Baptist Church (Church), also asserted a trespass claim. In September 2005 the State of Alaska sued Whittier for response costs, damages, and penalties arising from the leaked gasoline. Whittier tendered defense and indemnity for these five claims to ANIC. In December 2005 ANIC denied coverage for the lawsuits after determining that the pollution exclusion barred coverage for the claims.

Whittier sued ANIC for breach of contract, coverage by estoppel, bad faith, and punitive damages. Whittier moved for summary judgment, arguing that ANIC was estopped from raising any coverage defenses because it failed to defend Whittier against potentially covered claims. ANIC opposed Whittier's motion and cross-moved for summary judgment, arguing that each policy unambiguously excluded the leaked gasoline from coverage. Whittier opposed the cross-

motion and again moved for summary judgment, this time arguing that there were exceptions to the pollution exclusion. Whittier later moved for summary judgment on the theory there was no valid pollution exclusion in the personal injury coverage (Coverage B) of the ANIC policies.

■ ANIC filed an additional motion for summary judgment, arguing that it had properly denied all of Whittier's tenders of defense and indemnity. The superior court granted ANIC's motion and cross-motion for summary judgment and denied Whittier's motions.

Whittier appeals.

## III. DISCUSSION

### A. Standard of Review

■ We review grants of summary judgment de novo and affirm only if there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law.[3] We draw all reasonable inferences in favor of the non-prevailing party.[4]

■ Contract interpretation presents a question of law that we review de novo.[5] We look to the language of the disputed policy provision, other provisions of the policy, and relevant extrinsic evidence.[6] The policy generally determines the liability of the insurer.[7] We recognize a restriction on coverage if an insurer by plain language limits the coverage of its policy.[8] But because of inequities in bargaining power, we construe coverage broadly and exclusions narrowly, in favor of insureds.[9] To the extent that we deal with

---

**3.** *Morgan v. Fortis Benefits Ins. Co.,* 107 P.3d 267, 269 (Alaska 2005) (affirming grant of summary judgment to insurer because claimant's death fell under policy's intoxication exclusion).

**4.** *Id.*

**5.** *Nelson v. Progressive Cas. Ins. Co.,* 162 P.3d 1228, 1231 (Alaska 2007) (affirming grant of partial summary judgment after deciding that named driver exclusion was unambiguous and barred coverage for pedestrian's negligent entrustment claim).

**6.** *Id.*

**7.** *C.P. ex rel. M.L. v. Allstate Ins. Co.,* 996 P.2d 1216, 1222 (Alaska 2000).

**8.** *Id.*

**9.** *Hahn v. Alaska Title Guar. Co.,* 557 P.2d 143, 144–45 (Alaska 1976) (construing definition of "record" in insurance policy broadly in favor of insureds to include public land order filed with Federal Register).

issues of first impression, we adopt the rule most persuasive in light of precedent, reason, and policy.[10]

## B. The Absolute Pollution Exclusion

One of the most contested and highly litigated issues in the field of liability insurance is the scope of pollution exclusion clauses.[11] The first standard pollution exclusion was incorporated in commercial general liability policies in 1970 [12] to combat adverse selection and reduce moral hazard.[13] The original exclusion, sometimes called the "sudden and accidental" or "qualified" pollution exclusion, contained an exception for "discharge, dispersal, release, or escape [that] . . . is sudden and accidental." [14] Applying Alaska law, three courts construed the qualified pollution exclusion in favor of policyholders.[15]

In 1986 regulatory authorities approved a major expansion in the scope of the pollution exclusion by eliminating the sudden and accidental exception.[16] The revised exclusion is so broad that it is often termed "absolute," [17]

even though it does not exclude all pollution-related liability.[18]

The ANIC policies include Coverage A, covering bodily injury and property damage, Coverage B, covering personal and advertising injury, and Coverage C, covering medical payments for bodily injury. Coverage A contains an absolute pollution exclusion (subsection 2.f.(1)) excluding " 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." Pollutants are defined under Coverage A as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

### 1. The pollution exclusion contained in the ANIC policies is not ambiguous.

Whittier argues that gasoline is not a pollutant under the exclusion; it alternatively argues that the exclusion is ambiguous as to whether it excludes leaked gasoline

---

**10.** *Gov't Employees Ins. Co. v. Graham–Gonzalez,* 107 P.3d 279, 284 (Alaska 2005) (holding that statute requiring that insurers "shall offer" underinsured motorist coverage did not require that application forms also state amount of premium).

**11.** KENNETH S. ABRAHAM, ENVIRONMENTAL LIABILITY INSURANCE LAW 145 (1991).

**12.** DONALD S. MALECKI & ARTHUR L. FLITNER, COMMERCIAL GENERAL LIABILITY 40 (7th ed.2001). Insurers began issuing a standard "comprehensive general liability" policy in 1940. 9A LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 129:1, at 129–5 (3d ed.2005). In 1986 the standard policy became a "commercial general liability" policy. *Id.*

**13.** ABRAHAM, *supra* note 11, at 152–53; *see* Douglass Farnsworth, *Moral Hazard in Health Insurance: Are Consumer–Directed Plans the Answer?,* 15 ANNALS HEALTH L. 251, 253 (2006) ("Moral hazard, simply put, is the tendency of an individual to behave differently in regards to a particular event depending on the presence of insurance."); Peter Siegelman, *Adverse Selection in Insurance Markets: An Exaggerated Threat,* 113 YALE L.J. 1223, 1223 (2004) ("The phrase 'adverse selection' was originally coined by insurers to describe the process by which insureds utilize private information of their own riskiness when deciding to buy or forgo insurance.").

**14.** *See generally Sauer v. Home Indem. Co.,* 841 P.2d 176, 179 n. 3 (Alaska 1992).

**15.** *Id.* at 181–82 n. 8 (declining to rule definitively on language in pollution exclusion but noting variety of interpretations among other jurisdictions, and holding that "discharge" from sewage leak that occurred "over several days or a few weeks" was arguably "sudden and accidental"); *Mapco Express, Inc. v. Am. Int'l Speciality Lines Ins. Co.,* No. 3AN–95–8309 (Alaska Super. July 31, 1998) (determining that "sudden" is ambiguous and must be construed in favor of policyholder); *see also MAPCO Alaska Petroleum, Inc. v. Cent. Nat'l Ins. Co. of Omaha,* 795 F.Supp. 941, 947 (D.Alaska 1991) (concluding that summary judgment was inappropriate because whether groundwater contamination that occurred without notice was "sudden and accidental" was question of fact).

**16.** ABRAHAM, *supra* note 11, at 160–61.

**17.** *Id.* at 161.

**18.** *Id.* ("For example, certain kinds of liabilities clearly are not mentioned within the exclusion. Most prominent among these is liability for pollution caused by finished products in the possession of others. . . . In addition, the meaning of a number of terms in the exclusion is unclear.").

from coverage.[19] As Whittier notes, when a clause in an insurance policy is ambiguous, we must accept the interpretation that most favors the insured.[20] But "[a]n ambiguity does not exist" merely because the parties disagree as to the interpretation of a term.[21] We emphasized in *Nelson v. Progressive Casualty Insurance Co.* that ambiguity is only present if inconsistent, but reasonable, interpretations of the contract are possible.[22]

Although we have not, before now, had the opportunity to determine whether the absolute pollution exclusion generally contained in commercial general liability policies is ambiguous, numerous jurisdictions have addressed whether leaked gasoline is a pollutant within the meaning of the policy exclusion. Whittier relies heavily on two cases determining that the absolute pollution exclusion was ambiguous.[23] Like Whittier, the insured in the first case, *American States Insurance Co. v. Kiger*, owned and operated a gas station, and the absolute pollution exclusion was almost identical to Whittier's pollution exclusion.[24] The *Kiger* court held that "pollution" in re-

gards to the policy was ambiguous and construed the term against the insurer.[25] The court reasoned that although gasoline is sometimes referred to as a pollutant, the language of a policy must be explicit to exclude coverage for damage caused by leakage of gasoline and that the term "pollutant" did not obviously include gasoline.[26]

Whittier also cites *Hocker Oil Co. v. Barker–Phillips–Jackson, Inc.*[27] Deeming the *Kiger* court's rationale persuasive, the *Hocker* court concluded that the insurer's failure to specifically identify gasoline as a pollutant in its pollution exclusion "resulted in uncertainty and indistinctness," and therefore held that the policy was "ambiguous as to whether gasoline was a pollutant for purposes of the exclusion."[28]

But we conclude that the better-reasoned approach is the one advocated by ANIC and adopted by the majority of courts that have reviewed a pollution exclusion identical or markedly similar to the clause in the ANIC policies.[29] We hold that there is no ambigui-

19. As an initial matter, in all of its arguments Whittier asserts that "[b]ecause there was at least a 'possibility' of insurance coverage, the trial court should have agreed with Whittier that ANIC was estopped from asserting any coverage defenses when it refused to provide Whittier with any defense." But the possibility of coverage is irrelevant; the question here turns on contract interpretation. "[A] duty to defend does not arise whenever an insurer and an insured have a dispute over coverage." *Makarka v. Great Am. Ins. Co.*, 14 P.3d 964, 969–70 (Alaska 2000) (stating that "where coverage turns solely on the interpretation of policy language that has never been reviewed by this court, that fact alone is not enough to create a possibility of coverage that required a defense").

20. *West v. Umialik Ins. Co.*, 8 P.3d 1135, 1138 (Alaska 2000); *Starry v. Horace Mann Ins. Co.*, 649 P.2d 937, 939 (Alaska 1982).

21. *C.P. ex rel. M.L.*, 996 P.2d at 1222 n. 38 (citing *Modern Constr., Inc. v. Barce Inc.*, 556 P.2d 528, 529 (Alaska 1976)); *accord Jarvis v. Aetna Cas. & Sur. Co.*, 633 P.2d 1359, 1363 (Alaska 1981).

22. *Nelson v. Progressive Cas. Ins. Co.*, 162 P.3d 1228, 1234 (Alaska 2007).

23. To the extent Whittier contends or seems to be contending that loss control reports requested and obtained by ANIC were extrinsic evidence bearing on whether the policies' exclusion was

ambiguous or must, in any event, be interpreted in the insured's favor, we address the loss control reports in Part III.B.2.

24. *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 948 (Ind.1996).

25. *Id.* at 949.

26. *Id.*

27. *Hocker Oil Co. v. Barker–Phillips–Jackson, Inc.*, 997 S.W.2d 510 (Mo.App.1999).

28. *Id.* at 518.

29. As the Complex Insurance Claims Litigation Association states in its amicus curiae brief, "[o]ver 100 appellate court cases and 36 jurisdictions have ruled that pollution exclusions like the one at issue here unambiguously bar coverage for harms caused by exposure to many different types of pollutants." *See Deni Assocs. of Fla. Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So.2d 1135, 1137 n. 2 (Fla.1998) (noting 100 cases and thirty-six jurisdictions had held pollution exclusion not ambiguous); *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wash.2d 165, 110 P.3d 733, 738 (2005) (listing cases); *see, e.g., Heyman Assocs. No. 1 v. Ins. Co.*, 231 Conn. 756, 653 A.2d 122, 132–33 (1995) (absolute pollution exclusion unambiguous and spilled fuel is pollutant); *Millers Mut. Ins. Ass'n v. Graham Oil Co.*, 282 Ill.

ty because, even though gasoline that is in the UST is a "product" for purposes of other parts of the insurance policy, when the gasoline escapes or reaches a location where it is no longer a useful product it is fairly considered a pollutant.

### 2. Whittier's interpretation is unreasonable.

 Alaska has adopted the doctrine of reasonable expectations.[30] We can construe an insurance policy under the reasonable expectations doctrine without finding ambiguity in the policy; therefore, even though we have determined that the exclusion is not ambiguous, Whittier may still prevail under the reasonable expectations doctrine.[31] Because an insurance policy is an adhesion contract, we construe any policy restrictions in liability policies to give effect to the insured's objectively reasonable expectations.[32] Thus, with regards to liability policies, the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.[33] Under this doctrine, we examine the language of the disputed provisions, other provisions, and relevant extrinsic evidence.[34]

Whittier's claim is not supported by any of these sources. As to the language of the disputed policy provision, Whittier argues that the absence of the term "gasoline" from the definition of pollutants in the ANIC policies demonstrates that ANIC did not intend gasoline to be considered a pollutant. But because public policy disfavors requiring an exhaustive list of pollutants in insurance policies[35] and the majority of courts deciding the issue have rejected similar arguments,[36] we are unpersuaded by Whittier's argument.

As to other provisions, Whittier argues that gasoline was its "[u]seful [p]roduct" within coverage of the ANIC policies. But, again, we distinguish between gasoline that is contained in a UST and available for sale as a gas station's product, and leaked gasoline that contaminates soil and water as a pollutant.[37]

Finally, as to extrinsic evidence, Whittier argues that ANIC's underwriting files "demonstrate that ANIC was aware of the potential risks it faced from Whittier's UST[ ]." Whittier notes that ANIC requested and obtained "Loss Control" reports in 1993 and 1996, both of which specifically discussed Whittier's USTs. Whittier argues that the request for information about the USTs indicates that ANIC acknowledged that it would be liable for any loss that arose from the gasoline in the USTs; it alternatively argues

App.3d 129, 218 Ill.Dec. 60, 668 N.E.2d 223, 229 (1996) (gasoline that migrated from storage tank to neighbor's subsoil is pollutant); *Harrison v. R.R. Morrison & Son, Inc.*, 862 So.2d 1065, 1072 (La.App.2003) (pollution exclusion unambiguous and gasoline is pollutant).

30. *West*, 8 P.3d at 1138.

31. *Nelson*, 162 P.3d at 1235 (citing *West*, 8 P.3d at 1138).

32. *Id.* (holding that named driver exclusion was valid exception to statutorily mandated liability coverage).

33. *Bering Strait Sch. Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295 (Alaska 1994) (citing Robert Keeton, Basic Text on Insurance Law § 6.3(a), at 351 (1971)).

34. *Nelson*, 162 P.3d at 1235 (quoting *Williams v. Crawford*, 982 P.2d 250, 253 (Alaska 1999)).

35. *See Harnischfeger Corp. v. Harbor Ins. Co.*, 927 F.2d 974, 976 (7th Cir.1991):

> Drafters cannot anticipate all possible interactions of fact and text, and if they could the attempt to cope with them in advance would leave behind a contract more like a federal procurement manual than like a traditional insurance policy. Insureds would not be made better off in the process. The resulting contract would be not only incomprehensible but also more expensive.

36. *See, e.g., Truitt Oil & Gas Co. v. Ranger Ins. Co.*, 231 Ga.App. 89, 498 S.E.2d 572, 574 (1998) (noting that usual significance of words used in policy exclusion rendered it unnecessary for gasoline to be specifically listed as pollutant).

37. *See, e.g., id.* at 574 (determining that although gasoline was specifically referred to as insured's "product," court was not required to conclude that leaked gasoline was not a "pollutant"); *Crescent Oil Co. v. Federated Mut. Ins. Co.*, 20 Kan.App.2d 428, 888 P.2d 869, 872–73 (1995)

that the reports demonstrate that the policy is ambiguous as to whether the policy covers damages from UST leaks.

There is no indication that, before the last of the five policies expired, Whittier had seen or been aware of the loss control reports. The documents therefore could not have led Whittier to reasonably expect the ANIC policies would cover claims that gasoline leaking from the USTs had caused property damage.

Nor could the reports reasonably give rise to an inference that the insurer thought there was coverage for claims arising from gasoline that leaked from USTs. When reviewing a grant of summary judgment we draw all reasonable inferences in favor of the non-prevailing party below.[38] But it is not reasonable to infer that ANIC's underwriting files, which describe the USTs as part of a larger description of Whittier's facilities and do not discuss the likelihood of a UST leak or estimate the financial risk of a UST leak, could indicate that the ANIC policy might cover damages stemming from a gasoline leak.[39]

Moreover, the existence of the information contained in the loss control reports does not demonstrate that the pollution exclusion was ambiguous. As ANIC argues, there are other reasons why ANIC's underwriting files would contain notes about Whittier's USTs, including potential liability risks that a UST could explode, collapse, or cause the ground to give way suddenly.

ANIC argues that the lawsuits filed against Whittier demonstrate that gasoline is a pollutant. The private party complaints specifically charge Whittier with "polluting"

(mentioning that leaking gasoline was not insured's "product").

38. *Morgan v. Fortis Benefits Ins. Co.,* 107 P.3d 267, 269 (Alaska 2005).

39. *See Holland v. Union Oil Co.,* 993 P.2d 1026, 1031–32 (Alaska 1999) (inference of just cause employment relationship not reasonable from one-page document merely addressing potential behavior problems because no reasonable juror could draw that inference).

40. *C.P. ex rel. M.L. v. Allstate Ins. Co.,* 996 P.2d 1216, 1223 (Alaska 2000).

41. *See Peterson v. Wirum,* 625 P.2d 866, 872–73 (Alaska 1981) (determining that Peterson's conduct after loan fell through—including agreeing

the neighboring lands. The state complaint seeks "costs associated with the abatement, containment, or removal of the pollutant." But absent contract language clearly specifying an objective perspective, our practice is to determine the meaning of a provision from the perspective of the insureds claiming coverage, not from that of third-party litigants.[40]

■ In line with this practice, ANIC's argument that Whittier knew that the ANIC policies did not cover the damages from the UST leak is more persuasive. In 1999 Whittier applied for a "Storage Tank System Third Party Liability and Corrective Action Policy" from Zurich. The application asked, "Do you currently have pollution coverage for the tanks applied for on this application?" Whittier answered "NO." A party's conduct may be evidence of its intent even if the conduct arose from a single instance so long as the conduct evinces an interpretation contrary to the party's interest.[41] Therefore Whittier could not have reasonably expected that the ANIC policies would cover damages from a UST gasoline leak.

Because the language of the policies and extrinsic evidence do not suggest that the parties reasonably believed that damages stemming from leaked gasoline would be covered under the ANIC policies, we conclude that the reasonable expectations doctrine does not assist Whittier.

## C. Other Provisions of the Policy Do Not Restore or Otherwise Provide Coverage.

■ Whittier argues that even if we determine that the pollution exclusion unam-

to look for other loan providers and expressing interest in loaning money herself—demonstrated that, contrary to her litigation position, Peterson understood that loan provision was not condition precedent); *Australaska Corp. v. Sisters of Charity of House of Providence,* 397 P.2d 966, 968 (Alaska 1965) (interpreting warranty clause against corporation whose president expressed during deposition interpretation consistent with opposing party's interpretation). *But see Sprucewood Inv. Corp. v. Alaska Hous. Fin. Corp.,* 33 P.3d 1156, 1163–64 (Alaska 2001) (determining that evidence of AHFC's own employees' concessions that contract did not specify how buildings were to be demolished was insufficient to challenge trial court finding that AHFC believed, at time of formation, that contract required complete destruction of buildings rather than remov-

biguously bars coverage for damages from leaked gasoline, it may still prevail based on various provisions of the ANIC policies to which the pollution exclusion does not apply.

Whittier first argues that ANIC should cover the claims because Whittier contractually assumed liability for its UST contractor. It asserts that the exceptions for "insured contract[s]" and "completed operations" apply because of this assumed liability.

The ANIC policies contain an exclusion for contractual liability.[42] But there is an exception to that exclusion for damages "[a]ssumed in a contract or agreement that is an 'insured contract.'"[43]

In February 1995 the state conferred a grant on Whittier to offset Whittier's cost of installing the new tank. The state's complaint against Whittier asserts that the state's award letter contains an indemnity provision. Whittier therefore argues that because Whittier agreed to indemnify the state for the negligence of Whittier's contractor, the contractor was covered under the insured contract exception.

Whittier also argues that the pollution exclusion does not apply because the leaked gasoline was the result of the contractor's "completed operations." Whittier points to a workbook issued by the Insurance Services Office, Inc. (ISO), an agent of ANIC and a company supplying underwriting claims information for insurance companies; the workbook states that "there is coverage for

some off-site emissions, including the Products/Completed Operations exposure."

■ Whittier's assumed-liability arguments are unavailing. The assumption-of-liability exception does not apply because the state is not being sued. Moreover, there is no coverage under the products-completed operations hazard provision because an exclusion explicitly states when it does not apply to the provision;[44] the pollution exclusion does not contain such a statement. And in any event, an insured cannot create coverage under a policy containing a pollution exclusion by agreeing to indemnify a third party for the same risk.[45]

■ Whittier next argues that the Church's trespass claim should be covered under Coverage B. Coverage B contains a pollution exclusion worded identically to the exclusion in Coverage A, excluding "'[p]ersonal injury' or 'advertising injury' ... [a]rising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." The definition of pollutants is the same as the definition under Coverage A. But the pollution exclusion was not added to Coverage B until 1996. Although the fill pipe did not break until 1997, Whittier argues that there was no valid pollution exclusion under Coverage B for any year because ANIC did not give Whittier advance notice of the change as required by statute.[46]

al and sale when employees also testified that contract required buildings to be broken up).

**42.** That exclusion states: "This insurance does not apply to ... '[b]odily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."

**43.** An insured contract is defined in part as:
That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**44.** For example, the exclusion for "Damage to Property" under Coverage A states that "Para-

graph (6) of this exclusion does not apply to 'property damage' included in the 'products-completed operations hazard.'"

**45.** *See Capital Alliance Ins. Co. v. Cartwright*, 236 Ga.App. 554, 512 S.E.2d 666, 668 (1999) (in indemnification suit by third party who contracted with insured so that insured would indemnify third party, court determined that injury arose from risk excluded by policy and thus was likewise excluded by policy).

**46.** AS 21.36.235(a) requires that "if after renewal there will be a material restriction or reduction in coverage not specifically requested by the insured, written notice shall be mailed to the insured and to the agent or broker of record as required by AS 21.36.260 ... at least 45 days before expiration of a business or commercial policy." See also AS 21.36.235(b), which requires that "the existing policy shall continue until the insurer provides notice for the time

Regardless of whether there was a valid pollution exclusion added to Coverage B, there is no coverage for the trespass claims under Coverage B. Whittier argues that the trespass claim is covered under Coverage B because it arises from "[t]he ... wrongful entry into ... premises that a person occupies by or on behalf of its owner, landlord or lessor." But Whittier is not the owner, landlord, or lessor of the Church's property; Coverage B applies to landlord-tenant situations.[47] And, because accepting Whittier's interpretation of Coverage B would render the pollution exclusion in Coverage A meaningless, we are persuaded by the reasoning of other courts rejecting similar attempts to use Coverage B to evade the pollution exclusion in Coverage A.[48]

 Finally, Whittier argues that there is coverage under an "exception" for liability Whittier would have in the absence of government-required cleanup. Subsection f.(1) of the pollution exclusion, as discussed above, excludes from coverage all liability for "[b]odily injury" or "property damage" arising from "pollutants"; subsection f.(2) separately excludes coverage for "loss, cost or expense arising out of any" governmental cleanup orders or claims. Whittier asserts that a paragraph following f.(2) and stating that "this paragraph does not apply to liability ... the insured would have in the absence of such request" applies with equal force to except the claims against Whittier from the exclusion in f.(1). We disagree. If an exception restores coverage, the coverage remains "subject to the limitation of each and every exclusion";[49] therefore, the pollution exclu-

period required by (a) of this section for that policy."

**47.** *See, e.g., U.S. Fid. & Guar. Co. v. Goodwin,* 950 F.Supp. 24, 27 (D.Me.1996) (determining that, because personal injury provision "unambiguously requires that the wrongful entry be committed by the owner, landlord, or lessor of the room, dwelling, or premises," insured's trespass on neighbor's property when cutting trees was outside personal injury coverage).

**48.** *See, e.g., Lakeside Non–Ferrous Metals, Inc. v. Hanover Ins. Co.,* 172 F.3d 702, 705–06 (9th Cir.1999) (stating that allowing insured to recast its claim under personal injury provision would "render[ ] the pollution exclusion a dead appendage to the policy" (quoting *Titan Corp. v. Aetna*

sion in f.(1) still bars coverage for bodily injury or property damage stemming from pollution.[50]

## IV. CONCLUSION

Because the pollution exclusion unambiguously excludes leaked gasoline from coverage and the other policy provisions do not restore or otherwise provide coverage, we AFFIRM the judgment below.

*Cas. & Sur. Co.,* 22 Cal.App.4th 457, 27 Cal. Rptr.2d 476, 486 (1994))).

**49.** *Stillwater Condo. Ass'n v. Am. Home Assurance Co.,* 508 F.Supp. 1075, 1079 (D.Mont.1981); accord *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 795 (1979) ("If any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions.").

**50.** Because we affirm the superior court's grant of summary judgment to ANIC, we do not need to address Whittier's argument that the court erred in granting summary judgment to ANIC on Whittier's bad faith claim.